**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

| | |
|---|---|
| CLARENCE COCROFT and TRU SOURCE MEDICAL CANNABIS, LLC<br><br>     *Plaintiffs*,<br><br>v.<br><br>CHRIS GRAHAM, in his official capacity as the Commissioner of the Mississippi Department of Revenue, PAT DAILY, in his official capacity as Chief of Enforcement of the Mississippi Alcoholic Beverage Control Bureau and DR. DANIEL P. EDNEY, in his official capacity as State Health Officer for State of Mississippi Department of Health,<br><br>     *Defendants.* | Civil Action No. <u>3:23cv431-MPM-JMV</u> |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Clarence Cocroft and Tru Source Medical Cannabis, LLC file this Complaint for Declaratory and Injunctive Relief and sue Defendants Chris Graham, in his official capacity as the Commissioner of the Mississippi Department of Revenue, Pat Daily, in his official capacity as Chief of Enforcement of the Mississippi Alcoholic Beverage Control Bureau, and Dr. Daniel P. Edney, in his official capacity as State Health Officer for the State of Mississippi Department of Health, as follows:

### INTRODUCTION

1.     This is a First Amendment lawsuit on behalf of Clarence Cocroft and his business, Tru Source Medical Cannabis, LLC, challenging the Mississippi Department of Health's regulation banning all advertising for state-licensed medical-marijuana dispensaries. The Department's complete ban on advertising and marketing in any media violates the First

1

Amendment of the United States Constitution by prohibiting business owners like Clarence from engaging in truthful commercial speech to promote their legal businesses. As a result of Defendants' ban, Tru Source has struggled to reach its desired clientele, cannot promote its products or its location, and has sustained and will continue to sustain significant harm.

## PARTIES

2. Plaintiff Clarence Cocroft is a United States citizen and resident of the State of Tennessee. He owns Tru Source Medical Cannabis, LLC, which is located in DeSoto County, Mississippi.

3. Plaintiff Tru Source Medical Cannabis, LLC is a Mississippi limited-liability company in good standing located in Olive Branch, Mississippi. It is a family-operated medical marijuana dispensary licensed by the State of Mississippi and in compliance with all applicable health and safety regulations.

4. Defendant Chris Graham ("Commissioner Graham") is the Commissioner of the Mississippi Department of Revenue. Commissioner Graham has direct authority over the Mississippi Department of Revenue and is charged with the responsibility of enforcing the related laws, regulations, and policies, including the licensure of medical marijuana businesses in Mississippi. He is sued only in his official capacity.

5. Defendant Pat Daily ("Officer Daily") is the Chief of Enforcement of the Mississippi Alcoholic Beverage Control Bureau. Officer Daily has direct authority over and the Mississippi Alcoholic Beverage Control Bureau—the specific division of Mississippi Department of Revenue that is charged with the responsibility of enforcing the related laws, regulations, and policies, including the licensure of medical marijuana businesses in Mississippi. He is sued only in his official capacity.

6.     Defendant Dr. Daniel P. Edney ("Officer Edney") is the State Health Officer. Officer Edney has direct authority over the Mississippi State Department of Health's personnel and is charged with the responsibility of enforcing the related laws, regulations, and policies. He is sued only in his official capacity.

## JURISDICTION AND VENUE

7.     Plaintiffs bring this civil rights lawsuit pursuant to the First and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, for violations of the First Amendment to the United State Constitution.

8.     Plaintiffs seeks declaratory and injunctive relief against Defendants' enforcement of the Mississippi Department of Health's regulation prohibiting all forms of advertising or marketing in any media of medical marijuana dispensaries that are perfectly legal under Mississippi law. *See generally* Code Miss. R. 15-22:3.2.1.

9.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, as Plaintiffs' claim arises under the First Amendment of the U.S. Constitution.

10.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(e)(1), as a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### Changing Attitudes Toward and Legalization of Medical Marijuana in Mississippi

11.     Americans' attitudes toward the legalization of medical marijuana have shifted. While every state once prohibited the production, distribution, and possession of marijuana, many states have repealed or limited such prohibitions over the last few decades.

12.     Indeed, as of April 2023, 38 states, three territories, and the District of Columbia allow the medical use of cannabis products.

13.     Moreover, the Rohrabacher-Farr Amendment, a rider to appropriations bills first approved in 2014 and in effect at the time the Department of Health enacted the Ban, forbids the U.S. Department of Justice from spending funds to prosecute state-legal medical marijuana operations. *See United States v. McIntosh*, 833 F.3d 1163, 1175–77 (9th Cir. 2016).

14.     Mississippi is among the many American states that now support legalized medical marijuana.

15.     In 2020, Mississippi voters approved an initiative legalizing medical marijuana with 69% of the vote. Although six months later the Mississippi Supreme Court invalidated the initiative on procedural grounds, *see Butler v. Watson (In re Initiative Measure No. 65)*, 338 So. 3d 599 (Miss. 2021), support for legalization remained strong.

16.     Mississippians then sought to legalize medical marijuana through traditional legislation.

17.     State Senator Kevin Blackwell sponsored Senate Bill 2095, the Mississippi Medical Cannabis Act.

18.     Eventually Senate Bill 2095 passed with landslide votes of 103-13 in the state House and 46-4 (with one abstention) in the state Senate in January 2022.

19.     Governor Reeves signed the bill into law on February 2, 2022. In a social media statement discussing the law, he acknowledged that "there are individuals in our state who could do significantly better if they had access to medically prescribed doses of cannabis."

20.     The Mississippi Medical Cannabis Act, which became effective immediately upon signing, legalized medical marijuana in Mississippi. *See generally* Miss. Code. Ann. §§ 41-137-1 to -67.

21.     The Act governs all facets of the cultivation, disposal, processing, research, testing, transportation, and use of medical marijuana in Mississippi.

22.     It permits valid prescription holders to use medical marijuana in the treatment of certain debilitating medical conditions, including cancer, Parkinson's disease, Huntington's disease, muscular dystrophy, HIV/AIDS, hepatitis, ALS, Crohn's disease, ulcerative colitis, sickle-cell anemia, Alzheimer's disease, dementia, post-traumatic stress disorder, autism, cachexia or wasting syndrome, chronic pain, severe or intractable nausea, seizures, and severe and persistent muscle spasms, among others. *Id.* § 41-137-3(r).

23.     The Act gives the Mississippi Department of Health "the ultimate authority for oversight of the administration of the medical cannabis program." *Id.* § 41-137-7(1). And it instructs the Department of Health to "coordinate" its activities with the Mississippi Department of Revenue "in order to best effectuate the purpose and intent" of the Act. *Id.*

24.     Under the Act, the Department of Health is responsible for, among other things:

    a.      "The licensing, oversight and inspection of cannabis testing facilities and cannabis research facilities;

    b.      "The licensing of cannabis cultivation facilities, cannabis processing facilities, cannabis transportation entities and cannabis disposal entities;

    c.      "The application and licensing of registry identification cards for qualifying patients and designated caregivers;

    d.      "The registering of practitioners in accordance with this chapter; and

    e.      "The selection, certification and oversight of the statewide seed-to-sale tracking system as provided for in" the Act.

*Id.* § 41-137-7(3).

25.     One of the details that the Act expressly leaves to the discretion of the Department of Health is the regulation of advertising and marketing for medical cannabis establishments. *Id.* § 41-137-41(1)(d)(x).

**The Department of Health Bans Dispensary Advertising & Marketing in Any Media**

26.     The Act gives the Department of Health the authority to establish and promulgate rules and regulations governing "[r]estrictions on the advertising, signage, and display of medical cannabis." *Id.*

27.     Although the Act specifies that "the restrictions may not prevent appropriate signs on the property of a dispensary, listings in business directories, including phone books, listings in cannabis-related or medical publications, display of cannabis in company logos and other branding activities, display on dispensary websites of pictures of products that the dispensary sells, or the sponsorship of health or not-for-profit charity or advocacy events," the regulation of advertising is otherwise left to the agency's discretion. *Id.*

28.     The Department of Health, in light of that grant of authority, has prohibited dispensaries from advertising and marketing entirely. *See* Code Miss. R. 15-22:3.2.1.

29.     Under the regulation, "Medical Cannabis Establishments . . . are prohibited from advertising and marketing in any media." *Id.*

30.     The regulations define "advertising" and "advertisement" to mean "all representations disseminated in any manner or by any means, other than labeling, for the purpose of inducing, or which are likely to induce, directly or indirectly, the purchase of medical cannabis." *Id*. at -3.1.2(1). This does not include product labeling. *Id.*

31.     The regulations define "marketing" to refer to "the activity, set of institutions, and processes for creating, communicating, delivering, and exchanging offerings that have value for customers, clients, partners, and society at large. The term also includes all representations disseminated in any manner or by any means, other than labeling, for the purpose of inducing, or which are likely to induce, directly or indirectly, the purchase of medical cannabis." *Id*. at -3.1.2(6).

32.     Taken together, these provisions constitute a complete prohibition ("the Ban") on all forms of advertising not explicitly and specifically permitted by the Mississippi Medical Marijuana Act. *Compare id.* at -3.3.1–3.3.2, *with* Miss. Code Ann. § 41-137-41(1)(d)(x).

33.     The Ban explicitly prohibits advertising in "[b]roadcast or electronic media," including, but not limited to, radio, television, internet pop-up advertising, and social media. Code Miss. R. at -3.2.1(1).

34.     The Ban explicitly prohibits advertising in "[p]rint media," including, but not limited to, newspapers. *Id.* at -3.2.1(2).

35.     Indeed, to the extent the Ban prohibits advertising in different forms of "media," it defines that term as broadly encompassing "the communication channels through which we disseminate news, movies, education, promotional messages, and other data. It includes, but is not limited to, physical and online newspapers and magazines, television, radio, billboards, telephone, internet, fax, social media and billboards." *Id*. at -3.1.2(7).

36.     The Ban explicitly prohibits advertising in other forms, including, but not limited to, mass texts or messaging; mass email communications; and solicited or paid patient, caregiver, or practitioner reviews, testimonies, or endorsements. *Id.* at -3.2.1(2).

37.     The Ban explicitly prohibits "[m]edical cannabis or medical cannabis products" from being "displayed in windows or public view" and "[a]dvertising in any manner that can be

viewable or otherwise perceived as a public space, including, but not limited to, adopt a highway signs, and electronic interstate signs." *Id.* at -3.2.1(3)(C)–(F).

38.     Under the Ban, dispensaries are essentially only permitted to have limited, regulation-compliant signage on their own property, *see id.* at -3.3.4, or maintain an internet presence with "general information" about the business, *see id.* at -3.3.2(1). *See also* Miss. Code Ann. § 41-137-41(1)(d)(x) (specifying types of advertising that the Department of Health may not restrict). Legal medical marijuana dispensaries may also sponsor charitable events without violating the Ban. *See id.* ("[T]he restrictions [on advertising] may not prevent . . . the sponsorship of health or not-for-profit charity or advocacy events.").

39.     In practice, this means that a legal medical marijuana dispensary may have an internet home page with basic contact information and a storefront sign identifying the business.

40.     In practice, this means that a legal medical marijuana dispensary may not have off-site signs informing potential customers of basic information like a dispensary's location, products, or prices. *See* Miss. Code Ann. § 41-137-41(1)(d)(x) ("[T]he restrictions [on advertising] may not prevent appropriate signs *on the property* of a dispensary." (emphasis added)).

41.     Whatever Mississippi's policy goals may be, the Ban prohibits more speech than necessary to accomplish them.

42.     The Department thus has at its disposal far less restrictive means to accomplish Mississippi's purported legitimate policy goals without prohibiting more speech than necessary.

43.     In fact, the Department already promulgates less-restrictive regulations that accomplish Mississippi's purported policy goals without prohibiting more speech than necessary.

**The Ban Restricts More Speech than Necessary to Regulate Misleading or Harmful Medical Marijuana Advertising**

44.     In addition to the Ban, the Department also enacted a regulation that restricts medical marijuana advertising similarly to how the federal government restricts tobacco advertising. *See* Code Miss. R. 15-22:3.2.2.

45.     This rule expressly prohibits any "Medical Cannabis Establishment" from "engag[ing] in advertising that contains any statement or illustration that . . . [m]akes any health, medicinal, or therapeutic claims about cannabis or cannabis products" or "[m]akes safety claims of any type." *Id.* at -3.2.2(3)–(4).

46.     This rule also expressly prohibits advertising that "[i]ncludes any image designed or likely to appeal to minors, including cartoons, toys, animals, or children or any other likeness, images, characters, or phrases that are designed in any manner to be appealing to children and/or youth." *Id.* at -3.2.2(6).

47.     This rule also expressly prohibits advertising that "[d]epicts the actual consumption of cannabis or cannabis products," "[p]romotes the overconsumption of cannabis or cannabis products," or "[i]ncludes the image of a cannabis leaf or bud." *Id.* at -3.2.2(1), (2), (5).

48.     Plaintiffs do not wish to do any of the types of advertising described in section 15-22:3.2.2, nor does this lawsuit challenge any of those regulations.

**Clarence Cocroft Overcomes Arduous Regulatory Barriers to Open Tru Source**

49.     Clarence Cocroft is the son of a Mississippi farmer and an educator. Though he now lives in Memphis, TN, he was born and raised in northern Mississippi, where he maintains strong roots.

50.     Clarence earned a master's degree in forensics and biotechnology and he authored science textbooks for two decades.

51. Clarence is also an entrepreneur that owns various properties in Mississippi, including four billboards.

52. Clarence has long thought that the legalization of marijuana could be a potential profit center at the intersection of his scientific and entrepreneurial interests.

53. Clarence also believes it is important for patients with debilitating conditions to be able to receive the treatment that best suits their medical needs.

54. When it became clear that Mississippi would legalize medical marijuana, Clarence recognized this would be a perfect opportunity to open a dispensary business. He accordingly began the arduous process to open the business.

55. Clarence began collecting the various documents that would be required to apply for the dispensary business license in January 2022. These documents included, among others, professional licenses and certifications, lease agreements, and business registration with the State of Mississippi.

56. Over the next seven months Clarence finalized Tru Source's budget, operational plan, and security plan—each a key component of the license application processes for the state and city.

57. The budget for Tru Source included an allocation of over $300,000 for advertising.

58. He also ensured that he and his staff completed all necessary training for opening and operating a cannabis dispensary business.

59. Clarence and his son AJ—who runs Tru Source's day-to-day operations—received training through Cannabis Training University, an online training program providing certifications for cannabis businesses that is accredited by the International Accreditors for Continuing Education and Training. The program they completed encompasses completion of ten

certifications—including a certification on opening a dispensary and another on opening a cannabis business.

60.     And because Clarence is interested in eventually having a fully vertical medical marijuana business—meaning his business would also grow its own marijuana plants—he also completed a highly specialized soil-health course in Bangalore, India.

61.     Clarence filed his first medical marijuana dispensary application on July 5, 2022. He was later told it was the first medical marijuana dispensary application in the State.

62.     The proposed location was ideal: It was already zoned to accommodate a medical marijuana dispensary, it complied with all proximity restrictions, and it was in a visible, high-traffic area near a popular Starbucks.

63.     But Clarence's first application was denied—and his $15,000 non-refundable application fee lost—because the proposed location was said to be within 1,000 feet of a church, school, or daycare. The basis for the denial was inconsistent with the findings of a sealed survey submitted with Clarence's original application materials that confirmed that the site was *not* within 1,000 feet of a church, school, or daycare.

64.     With his initial application rejected, Clarence and his team identified another suitable location in Olive Branch (on the site where Tru Source now sits). Upon identifying the site, Clarence contacted property management and the landlord and received permission to lease the location to operate a dispensary.

65.     Clarence again had IPD Civil Engineering survey the area to make sure this location complied with the various proximity restrictions. The survey concluded that "no school, church or child care facility's property boundary line was found within 1,000 [foot] radius of the site entrance" for this location.

66.     Thereafter, Clarence submitted his second dispensary business application and first-year license fee of $40,000 ($15,000 non-refundable application fee and $25,000 annual license fee) on August 17, 2022.

67.     Unlike Clarence's preferred original location—which was located in a high-traffic area and close to a popular Starbucks—Clarence's current location is hard to find and has no foot traffic and little vehicle traffic.

68.     This location also required complete build-out, which Clarence completed at substantial expense.

69.     On September 13, 2022, the Department sent Clarence an email informing him that the second application was approved and that the "dispensary license [was] now active."

70.     Tru Source's current license was issued on August 15, 2023. It is set to expire on September 13, 2024. There has not been any lapse in Tru Source's license.

**Tru Source Faces Operational Challenges Severely Aggravated by the Ban**

71.     The Mississippi Department of Revenue and the Alcoholic Beverage Control Bureau of Enforcement ("ABC")—the division of the Mississippi Department of Revenue that issues licenses for medical dispensary businesses and enforces regulations enacted under the Mississippi Medical Cannabis Act—published a "Checklist for Medical Cannabis Dispensary License" in June 2022.

72.     The checklist provides a detailed list of information that must accompany the license application for the application to be considered complete.

73.     At the bottom of the checklist, it also says that the "Mississippi Department of Health is the agency that will handle the licensing, regulating and enforcement of laws relating to

patient cards, medical practitioners, cannabis cultivation facilities, cannabis processing facilities, cannabis testing facilities, cannabis waste disposal entities, and cannabis transportation entities."

74. The checklist does not mention any restrictions on advertising—neither in the checklist itself nor on the explanation of the Department of Health's authority

75. Clarence relied on this checklist to confirm his application was compliant with all requirements and to inform him of relevant applicable regulations.

76. The difficult process of ensuring that Tru Source complied with all applicable rules continued after the license was issued.

77. Following issuance of the license, Clarence was called to the ABC office to sign for the Dispensary Regulations Manual, a document produced by the State providing the various regulations applicable to state-licensed medical marijuana dispensary businesses.

78. At the ABC office, the ABC agent assigned to Tru Source walked Clarence through each section of the Manual before Clarence signed for the Manual. That is when Clarence learned of the Ban.

79. The advertising prohibition was one of the sections the ABC agent discussed with Clarence.

80. Clarence was surprised to learn of the Ban because he had been told to comply with the checklist, which made no mention of advertising restrictions.

81. The only information regarding the Ban that Clarence got from the Department of Revenue was a statement on their webpage summarizing medical marijuana dispensary regulations that states, "Dispensaries shall comply with all restrictions on advertising and marketing set forth in Mississippi Department of Health regulations."

82.     Upon information and belief, that statement did not appear on the website until it was updated on August 11, 2022—*after* Clarence's first application, which was denied only due to concerns regarding its purported proximity to a daycare.

83.     At that same meeting, the ABC agent directed Clarence to draw a schematic for the dispensary. Clarence drew the schematic, which the ABC agent reviewed.

84.     Although the application had been approved using the same floorplan as Clarence's schematic drawing, the ABC agent informed Clarence that he would need to install a wall dividing the front door from the main sales floor.

85.     As soon as he left the office, Clarence worked to address these two issues.

86.     He immediately contacted the contractors to tell them they needed to install a wall.

87.     He also began to strategize about how to promote his business in light of the Ban.

88.     Prior to learning about the Ban, Clarence had planned to advertise Tru Source extensively.

89.     Clarence had planned and budgeted for various types of now-prohibited advertising, including print advertising, television advertising, radio advertising, podcast advertising, mobile messaging advertising, social media advertising, paid search advertising, and signage advertising.

90.     Clarence had specifically planned to use four billboards that he owns in the high-traffic casino strip to advertise Tru Source.

91.     Especially because the approved location for Tru Source is hard to find, Clarence planned to include directions to the dispensary in each of his advertisements.

92.     Especially because the approved location for Tru Source is hard to find, Clarence planned to put signs on the corner of two high-traffic streets near Tru Source that would direct clients toward the dispensary.

93.     Over the next few months, Clarence worked with his staff to identify what types of advertising he could do that were explicitly permitted by the Act and, thus, not prohibited by the Ban.

94.     At the same time, Tru Source was being built and completed. It took approximately four months to complete.

95.     On January 17, 2023, the ABC agent for Tru Source inspected the facilities. During the inspection the ABC agent verified that the facilities complied with all requirements, except for the logo for Tru Source. The original logo for Tru Source includes an illustration of a leaf (the "leaf logo"). According to the ABC agent, the leaf resembled a part of the cannabis leaf.

96.     The ABC agent thought that the leaf logo may have run afoul of the advertising restrictions. But he was unsure, so he called his supervisor to consult on whether the leaf logo could be used.

97.     The supervisors determined that it could not be. Clarence was informed that the leaf logo would need to be changed to one that did not contain any images or depictions resembling cannabis leaves.

98.     Apart from the logo, Tru Source otherwise passed the inspection. There were no other issues.

99.     Following the inspection, Clarence commissioned a new logo for Tru Source to comply with ABC's instructions.

100.    The new logo (the "lotus logo") depicts a purple lotus with the white silhouette of a person rising, instead of a leaf. This is the lotus logo:



101.    Clarence picked the lotus for the new logo because it seemed like an appropriate symbol for the arduous process to open Tru Source—lotuses, after all, grow from the mud and break through the surface of the water.

102.    Tru Source finally opened its doors to patients on March 16, 2023.

103.    It is the first state-licensed, Black-owned medical marijuana dispensary in Mississippi.

**Tru Source Provides Exceptional Service, but the Ban Severely Hampers Its Growth**

104.    Since opening eight months ago, Tru Source has provided exceptional service while complying with all applicable regulations.

105.    Tru Source serves a diverse set of patients suffering from various debilitating medical conditions, including, for example, cancer, post-traumatic stress disorder, and neurological issues.

106.    Clarence and his staff strive to know each of their patients well.

107.    Clarence and his staff provide personalized attention to each patient, ensuring that they provide the best services possible.

108. This attention and care has served Tru Source well: The patients are happy with the services they receive from Tru Source and are loyal customers.

109. Indeed, many of Tru Source's patients are happy to share their experiences.

110. Unsolicited and unpaid word-of-mouth from returning patients is one of the primary ways that new patients first learn about Tru Source.

111. But despite these positive experiences, Tru Source has struggled due to the Ban.

112. Medical marijuana is a new industry in Mississippi and many potential patients that may be eligible for the program are unaware of how it functions, how to secure a valid prescription and cannabis card, or what dispensaries are available in their area.

113. Many Mississippians who may be eligible to participate in the program are not aware of the dispensaries available to them. If Tru Source could advertise, it would be able to attract more customers and educate the public about this new-to-Mississippi industry. But because of the Ban, it cannot.

114. Prior to learning about the Ban, Clarence had budgeted more than $300,000 to advertising, but he's had to divert that money to other investments in the business (e.g., inventory) or to less effective but explicitly permitted forms of advertising.

115. Instead of promoting Tru Source through highly effective print advertising, broadcast advertising, other electronic advertising, sign advertising, or merchandise advertising, Clarence has only been able to advertise through the very few—and far less effective—forms of advertising that the Act explicitly allows.

116. For example, one form of "advertising" that the Act forbids the Department of Health from restricting is listing dispensaries on online directories that provide basic information and may include a listing of products. *See* Miss. Code Ann. § 41-137-41(1)(d)(x).

17

117.    Leafly.com and Weedmaps.com are online directories for dispensaries. Listings on such directories is one of the few forms of advertising that the Mississippi Medical Marijuana Act established the Department of Health cannot restrict. Because of this, Tru Source was listed on both websites.

118.    Because of the Ban, Clarence has to rely on these types of directories to promote Tru Source and inform potential customers of the dispensary's location, products, and prices.

119.    Depending on these directories is not a sound business strategy.

120.    Though these directories allow website users to search for dispensaries based on location, they are not targeted to specific places. This means that a listing on these directories is not as effective as a locally placed ad that informs patients in Mississippi about Tru Source and the medical marijuana program.

121.    And, despite being paid services, these directories cannot be relied on to always work well. For example, in mid-October 2023, staff at Tru Source noticed that the listing on Leafly.com was missing the list of the dispensary's products (something the Mississippi Medical Marijuana Act explicitly permits to be advertised, *see* Miss. Code Ann. § 41-137-41(1)(d)(x)).

122.    This error led Clarence to spend several days trying to correct the issue, having to contact Leafly.com multiple times.

123.    Upon information and belief, the error on the listing persisted intermittently for at least 10 days.

124.    Eventually, Clarence decided that he could no longer list Tru Source on Leafly.com because the error remained uncorrected for too long. Tru Source remains listed on Weedmaps.com.

125.    Another form of "advertising" that the Act forbids the Department of Health from restricting is sponsorship of not-for-profit events. *See id.*

126.     Tru Source has sponsored not-for-profit events as a means of advertising, including a charity golf tournament and 5K runs and walks.

127.     Although sponsoring not-for-profit events can help a business build good-will, as a form of advertising it is limited by attendance at the event.

128.     The Act also specifies that the Department of Health may not prohibit dispensaries from having appropriate signs on-site.

129.     Tru Source has on-site signage, but it is not sufficient to attract new patients.

130.     The building where Tru Source is located has a large sign above the front door with the words "Tru Source" and the lotus logo. This is the storefront:



131.     Although Tru Source's on-site signage complies with all applicable requirements, it is not effective at attracting new potential clients.

132.     Because Tru Source is located in an industrial park with no foot traffic and very little automobile traffic, new potential clients are unlikely to see these signs.

133.    In fact, the dispensary is even hard to find for new clients that are specifically looking for Tru Source.

134.    It is common for clients to call Tru Source and ask for directions the first time they go. Tru Source employees have to provide these clients with landmarks and step-by-step directions to find the dispensary.

135.    But for the Ban, Clarence would place signage on major roads near the dispensary to provide directions.

136.    Unlike businesses located on streets with a lot of traffic, Clarence cannot rely on potential customers seeing his on-site signage to discover Tru Source.

137.    Clarence believes that, because of its central location, the place he *originally* selected for Tru Source—the one specified in his first application—would have enabled patients looking for a dispensary to find out about his business.

138.    The Ban severely hampers Clarence's and Tru Source's ability to reach new potential customers.

139.    Although medical marijuana is a legal business in Mississippi, medical marijuana dispensaries are not permitted to advertise in the same ways that any other legal businesses advertise.

140.    Indeed, although marijuana is a legal business in Mississippi, medical marijuana dispensaries are not even permitted to advertise in the same ways that other legal—but more highly regulated—businesses advertise.

141.    For example, although Clarence cannot advertise Tru Source on his billboards, he can advertise other highly regulated businesses like strip clubs and casinos. Indeed, because he cannot advertise his own dispensary business, Clarence has rented his billboards to a casino.

20

142.     Similarly, while many businesses are commonly identified in marquees or other similar signage at the entrance to their respective parking lots, Clarence was advised that he could not "advertise" his business's existence or location in this way.

143.     For any business owner, the ability to communicate basic information about the business—like its location and the products it offers—is critical. That's no different for medical marijuana dispensaries.

144.     Plaintiffs want to be able to advertise like any other state-legal business to inform potential clients of information like:

        a.     The location of Tru Source;

        b.     The types of products available at Tru Source;

        c.     The prices of products at Tru Source, as well as any specials or promotions; and

        d.     How qualifying patients may get a medical cannabis card.

145.     By banning advertising in any media, the Department of Health prohibits Clarence and Tru Source from providing potential clients basic information about the business.

146.     Plaintiffs face stiff fines and penalties if they are found noncompliant with the Ban or other medical marijuana dispensary regulations.

147.     According to an information sheet provided in hard copy and through email to Clarence, a first offense for failing to comply with a regulation could result in fines of between $5,000 and $10,000 and/or suspension of one or more weeks.

148.     The sheet also includes the warning that "Violations may also result in Felony Criminal Charges."

21

## INJURY TO PLAINTIFFS

149.     The Ban violates Plaintiffs' right to free speech as guaranteed by the First Amendment to the United States Constitution.

150.     Plaintiffs want to advertise their legal business but cannot because of the Ban.

151.     Plaintiffs want to advertise their legal business in ways that allow them to effectively reach new customers but cannot because of the Ban.

152.     Plaintiffs want to advertise their legal business in ways that allow them to inform the public about Mississippi's medical marijuana program but cannot because of the Ban.

153.     Plaintiffs want to advertise their legal business in ways that allow them to inform the public about Tru Source's location, products, and prices but cannot because of the Ban.

154.     But for the unconstitutional Ban, Plaintiffs would advertise through print advertising.

155.     Because of the Ban, however, Plaintiffs would face fines and potential felony charges were they to advertise through print advertising.

156.     But for the unconstitutional Ban, Plaintiffs would advertise through broadcast advertising, including through television and radio.

157.     Because of the Ban, however, Plaintiffs would face fines and potential felony charges were they to advertise through broadcast advertising, including through television and radio.

158.     But for the unconstitutional Ban, Plaintiffs would advertise through podcast, social media, paid search, and native pay-per-click advertising.

159.     Because of Ban, however, Plaintiffs would face fines and potential felony charges were they to advertise through podcast, social media, paid search, and native pay-per-click advertising.

160.     But for the unconstitutional Ban, Plaintiffs would advertise through direct mailing advertising.

161.     Because of the Ban, however, Plaintiffs would face fines and potential felony charges were they to advertise through direct mailing advertising.

162.     But for the unconstitutional Ban, Plaintiffs would advertise through display advertising, including signage at bus stops and outlet mall entrances.

163.     Because of the Ban, however, Plaintiffs would face fines and potential felony charges were they to advertise through display advertising, including signage at bus stops and outlet mall entrances.

164.     But for the unconstitutional Ban, Plaintiffs would advertise through billboard advertising, including on billboards owned by Plaintiff Clarence Cocroft.

165.     Because of the Ban, however, Plaintiffs would face fines and potential felony charges were they to advertise through billboard advertising, including on billboards owned by Plaintiff Clarence Cocroft.

166.     But for the unconstitutional Ban, Plaintiffs would advertise by placing Tru Source's information on various types of products for sale, including t-shirts, hats, sweatshirts, hoodies, mugs, and lanyards.

167.     Because of the Ban, however, Plaintiffs would face fines and potential felony charges were they to advertise by placing Tru Source's information on various types of products for sale, including t-shirts, hats, sweatshirts, hoodies, mugs, and lanyards.

168.    But for the unconstitutional Ban, Plaintiffs would place signage near the location of Tru Source providing clients directions to the dispensary.

169.    Because of the Ban, however, Plaintiffs would face fines and potential felony charges were they to advertise by placing signage near the location of Tru Source providing clients directions to the dispensary.

170.    But for the unconstitutional Ban, Plaintiffs would not need to rely on online dispensary directories like Leafly.com or Weedmaps.com to get new customers.

171.    But for the unconstitutional Ban, Plaintiffs would advertise Tru Source's location.

172.    Because of the Ban, however, Plaintiffs would face fines and potential felony charges were they to advertise Tru Source's location.

173.    But for the unconstitutional Ban, Plaintiffs would advertise Tru Source's products.

174.    Because of the Ban, however, Plaintiffs would face fines and potential felony charges were they to advertise Tru Source's products.

175.    But for the unconstitutional Ban, Plaintiffs would advertise the prices of Tru Source's products.

176.    Because of the Ban, however, Plaintiffs would face fines and potential felony charges were they to advertise the prices of Tru Source's products.

177.    But for the unconstitutional Ban, Plaintiffs would advertise any special or promotions that Tru Source has.

178.    Because of the Ban, however, Plaintiffs would face fines and potential felony charges were they to advertise any special or promotions that Tru Source has.

179.    But for the unconstitutional Ban, Plaintiffs would advertise how to obtain a medical marijuana card to eligible patients.

180.     Because of the Ban, however, Plaintiffs would face fines and potential felony charges were they to advertise how to obtain a medical marijuana card to eligible patients.

181.     But for the unconstitutional Ban, Plaintiffs would be engaging in more speech in Mississippi in the form of advertising.

182.     Among other things, were the Ban's enforcement to be enjoined and the Ban declared unconstitutional, Plaintiffs would immediately begin engaging in the activities identified in Paragraphs 151–181 above, all of which are currently prohibited by the Ban.

## CAUSE OF ACTION

### Count I: The Ban Violates Plaintiffs' Right to Free Speech

183.     Plaintiffs reassert and reallege paragraphs 1–182 as if fully set forth herein.

184.     The Ban is unconstitutional under the First Amendment of the United States Constitution, which provides that "Congress shall make no law . . . abridging the freedom of speech."

185.     The First Amendment has been incorporated to apply to the states through the Fourteenth Amendment.

186.     The First Amendment applies to and protects the right to provide and exchange truthful information about legal products or to otherwise propose a lawful commercial transaction.

187.     The Ban prohibits truthful and non-misleading speech about a legal product.

188.     By banning truthful and non-misleading advertisements about a legal product, the Department of Health has abridged Plaintiffs' freedom of speech and the freedom of speech of anyone else similarly situated.

189.     By legalizing medical marijuana, the State of Mississippi has relinquished any interest in regulating the advertising of medical marijuana on the grounds that it proposes a criminal transaction.

190.     Under the First Amendment, a jurisdiction may not ban commercial speech because that speech concerns an activity that is illegal in another jurisdiction.

191.     Under the First Amendment, a jurisdiction may not ban commercial speech because it worries about how people will respond to true information about a legal product.

192.     Under the First Amendment, the Ban is *per se* illegitimate insofar as it seeks to manipulate consumer behavior by preventing the public from receiving truthful information about a legal product.

193.     The Defendants lack any legitimate interest—much less a substantial or compelling interest—in enacting and enforcing the Ban.

194.     The Ban does not directly or materially advance any sufficiently important government interest because all it does is restrict the flow of truthful information.

195.     The Ban is not appropriately tailored to any sufficiently important government interest because it prohibits more speech than necessary to achieve any such interest.

196.     The Department of Health has (and already implements) less-restrictive means to accomplish its legitimate government interests.

197.     Unless Defendants are enjoined from committing the above-described violations of the First Amendment, Plaintiffs will continue to suffer great and irreparable harm.

## REQUEST FOR RELIEF

Therefore, Plaintiffs respectfully request the following relief:

A. A declaratory judgment that, facially and as applied to Plaintiffs and all those similarly situated, the Ban violates the First Amendment to the United States Constitution;

B. A permanent injunction prohibiting Defendants and their agents from enforcing the Ban;

C. An award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

D. All further legal and equitable relief as the Court may deem just and proper.


Dated: November 13, 2023.                           Respectfully submitted,

                                                    /s/ Michael T. Lewis
Ari S. Bargil (FL Bar No. 71454)*                   Michael T. Lewis
Katrin Marquez (FL Bar No. 1024765)*                    *Lead Counsel*
INSTITUTE FOR JUSTICE                               MS Bar No. 1238
2 S. Biscayne Boulevard, Suite 3180                 LEWIS & LEWIS ATTORNEYS
Miami, FL 33131                                     1217 Jackson Ave E.
(305) 721-1600                                      Oxford, MS 38655-4001
abargil@ij.org                                      (662) 232-8886
kmarquez@ij.org                                     mike@lewisattorneys.com

*Pro Hac Vice* motions to be filed

                       *Counsel for Plaintiffs*